UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

ALLSTATE INSURANCE COMPANY,

Plaintiff,

CASE NO.:

vs.

FLORIDA INSTITUTE FOR NEUROLOGIC REHABILITATION, INC., and JOSEPH BRENNICK,

Defendants.

_______________________________________/

**COMPLAINT AND JURY TRIAL DEMAND**
**INJUNCTIVE RELIEF SOUGHT**

Plaintiff Allstate Insurance Company ("Allstate" and/or "Plaintiff"), by its attorneys, SMITH & BRINK, P.C. and CALLAHAN & MARTINEZ, L.L.C., allege as follows:

## I. INTRODUCTION

1. This lawsuit seeks damages incurred as a result of an insurance fraud scheme perpetrated against Allstate by defendants Florida Institute for Neurologic Rehabilitation, Inc. ("FINR") and Joseph Brennick ("Brennick") (collectively, "defendants").

2. FINR, a self-proclaimed leader in the treatment of traumatic brain injuries, neurorehabilitation, and neuropsychiatric disorders, and its co-conspirator Brennick, induced Allstate into paying in excess of $7,600,000.00 in fraudulent claims for

unnecessary medical services purportedly rendered to Allstate customers insured under Michigan automobile insurance policies.

3. The defendants conducted an elaborate marketing campaign in the State of Michigan that lured patients to FINR's facilities in Wauchula, Florida.

4. The defendants' fraudulent scheme began with false promises of comprehensive neurologic treatment to patients injured in automobile accidents.

5. Rather than providing the promised rehabilitative care intended to restore (as best as clinically possible) patients to their pre-morbid lives, FINR did nothing more than warehouse patients with no meaningful treatment or clinical progress.

6. The defendants' scheme deceived Allstate by falsifying medical records, invoices, bills, and other insurance claim documents ("False Medical Documentation") that were submitted to Allstate for payment under Michigan's No-Fault Insurance Act.

7. Allstate reasonably relied on the False Medical Documentation in paying No-Fault claims submitted by, or on behalf of, the defendants.

8. In reliance on the defendants' submissions, Allstate paid in excess of seven million dollars to FINR for claims that were not compensable under Michigan law.

9. All of the conduct alleged herein was undertaken intentionally.

10. By this pleading, Allstate brings claims against the defendants seeking money damages for: (a) violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c); (b) common law fraud; (c) payment under mistake of fact; (d) unjust enrichment; and (e) breach of contract.

11. Allstate's claim for compensatory damages includes: (a) first party insurance payments made by Allstate to the defendants in reliance upon the purported

provision of neurologic rehabilitative treatment, *see Exhibit 1 attached hereto*; (b) treble damages; (c) statutory interest; (d) costs; and (e) attorney's fees.

## II. THE PARTIES

12. Allstate Insurance Company is a wholly-owned subsidiary of The Allstate Corporation, an entity organized to exist under and by virtue of the laws of the State of Delaware.

13. Allstate Insurance Company maintains its principal place of business in Northbrook, Illinois.

14. Allstate Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of Michigan.

15. The Florida Institute for Neurologic Rehabilitation is a Delaware Corporation.

16. FINR's principal place of business is in Wauchula, Florida.

17. Brennick resides in and is a citizen of the State of Florida.

18. Brennick is the president of FINR.

19. Brennick is the sole owner and shareholder of FINR.

20. Brennick was the sole founder and incorporator of FINR.

## III. JURISDICTION AND VENUE

21. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331. Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367.

22. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the wrongful acts known to Allstate alleged herein with particularity

were carried out within the Middle District of Florida.

## IV. MICHIGAN'S UNLIMITED NO-FAULT AUTO INSURANCE

23. When a patient chose FINR, FINR obtained an assignment of benefits.

24. FINR is, therefore, an assignee of each patient's Allstate auto insurance policy.

25. As an assignee or third-party beneficiary, FINR assumed all aspects of the Allstate insurance policy including, without limitation, the choice of law clause which states, in part: "[t]his policy is issued in accordance with the laws of Michigan and covers property or risks principally located in Michigan. Subject to the following paragraph, any and all claims or disputes in any way related to this policy shall be governed by the laws of Michigan . . . ."

26. Allstate underwrites automobile insurance in the State of Michigan.

27. Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.

28. Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107(1)(a).

29. "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary." Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

30. A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable. Nasser, 435 Mich. at 49.

31. Claims for personal injury benefits under the No-Fault Act are available only if the benefits are "for accidental bodily injury" and only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ." Mich. Comp. Laws § 500.3105(1).

32. Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of the motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of loss sustained." Mich. Comp. Laws § 500.3142(2).

33. The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation." Mich. Comp. Laws § 500.3148(2)

## V. BACKGROUND ON FINR

### A. BRENNICK'S OWNERSHIP, MANAGEMENT, AND CONTROL OF FINR

34. Since FINR's incorporation, Brennick has been its sole president and sole officer, director, and shareholder.

35. Accordingly, at all relevant times, Brennick was responsible for and benefited from the services provided at and by FINR.

36. Brennick entered the neurologic rehabilitation industry under the tutelage of his father, Charles Brennick.

37. Charles Brennick owned New Medico Health Care Systems ("New Medico"), a chain of forty-two (42) brain injury rehabilitation facilities spanning fifteen states.

38. In 1992, the FBI raided New Medico's corporate headquarters as part of its investigation into allegations that New Medico promised "near-impossible cures to emotionally devastated families, overcharged patients, and discharged patients as their insurance ran out." *See* Peter Kerr, Company News: F.B.I. Seizes Records of New Medico, N.Y. Times, October 28, 1992, at D3, attached hereto at *Exhibit 2*.

39. The FINR campus was the site of a former New Medico franchise.

40. In 1992, amidst New Medico's legal troubles, ownership was transferred to Brennick and incorporated in its present form as FINR.

41. FINR operates under the sole control of Brennick.

42. At all relevant times, Brennick controlled all personnel decision-making, financial matters, and the day-to-day operations of FINR.

43. As discussed herein, FINR was used by Brennick to perpetrate a fraud.

**B. FINR'S LEGAL REQUIREMENTS PURSUANT TO FLORIDA HEALTH CARE LAWS**

44. FINR is a "transitional living facility" registered with the State of Florida Agency for Health Care Administration.

45. As a "transitional living facility," FINR is charged with providing specialized health care services "including, but not limited to, rehabilitative services, community reentry training, aids for independent living, and counseling to spinal-cord-injured persons and head-injured persons." FLA. STAT. ANN. § 400.805.

46. FINR is also a Brain and Spinal Cord Injury Program Designated Facility. As such, FINR "shall provide . . . a goal-oriented treatment program designed to improve the individual's physical, cognitive, communicative, behavioral, psychological, and social functioning, as well as to provide necessary support and supervision. A transitional living facility shall offer at least the following therapies: physical, occupational, speech, neuropsychology, independent living skills training, behavior analysis for programs serving brain-injured individuals, health education, and recreation." FLA. STAT. ANN. § 381.75(6)(c).

47. As a Brain and Spinal Cord Injury Program Designated Facility, FINR is also bound by the following statutory provision: "All residents shall use the transitional living facility as a temporary measure and not as a permanent home or domicile. The transitional living facility shall develop an initial treatment plan for each resident within 3 days after the resident's admission. The transitional living facility shall develop a comprehensive plan of treatment and a discharge plan for each resident as soon as practical, but no later than 30 days after the resident's admission. Each comprehensive treatment plan and discharge plan must be reviewed and updated as necessary, but no less often than quarterly. . . . The transitional living facility shall discharge any individual who has an appropriate discharge site and who has achieved the goals of his or her discharge plan or who is no longer making progress toward the goals established in the comprehensive treatment plan and the discharge plan." FLA. STAT. ANN. § 381.75(6)(d).

48. These basic legal requirements outline the minimum care to be provided to each patient admitted to FINR.

49. FINR's patients should also be safe, shall have a right to dignity, privacy,

and humane care, and shall be free from abuse, neglect, or exploitation. *Cf.*, *Youngberg v. Romeo*, 457 U.S. 307 (1982) (treatment of individuals involuntarily civilly confined); FLA. STAT. ANN. § 393.13 (bill of rights of persons who are developmentally disabled).

## VI. FINR'S MISREPRESENTATIONS TO ALLSTATE AND TO PATIENTS

50. FINR employed individuals, including those exclusively assigned to Michigan, to carry out its aggressive marketing program, which was designed to take advantage of Michigan's unlimited No-Fault payment limits.

51. These marketing efforts include, without limitation, online resources at http://www.finr.net, printed brochures and literature, presentations at conferences, and networking events.

52. FINR sponsors events in Michigan that cater to those with brain injuries.

53. FINR's marketing materials make numerous promises of comprehensive, thorough, and professional rehabilitative treatment.

54. FINR's mission statement, for example, provides that: "[t]hrough the provision of individualized assessment, restorative service and foundational retraining in behavior, psych-social, cognitive, physical functioning, communication, daily living, education and vocational areas, FINR seeks to assist its clients in attaining their maximum level of functioning and quality of life in their most normalized and least restrictive environment." *See* Florida Institute for Neurologic Rehabilitation, Inc., MISSION, PHILOSOPHY AND GOALS, annexed hereto at *Exhibit 3*.

55. FINR's mission statement also identifies one of the goals of its treatment as including "re-entry to the community." *See id.*

56. FINR's home page on its website describes its services as follows:

> [FINR] has developed a comprehensive brain injury continuum of care offering specialized inpatient evaluation and treatment for both children and adults. Through a pre-admission evaluation and medical records review, FINR develops individualized treatment programs. As a leader in traumatic brain injury (TBI), neurorehabilitation, and neuropsychiatric disorders, our continuum of care delivers clinically relevant and cost effective services with unparalleled continuity of care. The distinct programs in our continuum are designed for individuals with a wide range of complex medical, neurorehabilitation, neurobehavioral, and neuropsychiatric care needs.[1]

57. Most of Allstate's insureds were allegedly enrolled in FINR's adult post-acute rehabilitation program. This program promised a five-tiered approach to rehabilitative treatment, including: (1) intensive rehabilitation; (2) neurobehavioral rehabilitation; (3) forensic evaluation; (4) community integration; and (5) vocational rehabilitation.

58. FINR's "intensive rehabilitation," program promised the following testing and/or treatments:

- neuropsychological evaluation;
- occupational therapy;
- physical therapy;
- speech language pathology;
- rehabilitation nursing;
- medical management;
- pharmacologic assessment; and
- family education and training.[2]

59. FINR also promised additional programs as part of its "intensive rehabilitation" program. *See* Florida Institute for Neurologic Rehabilitation, Inc.,

---

[1] *See* Florida Institute for Neurologic Rehabilitation, BRAIN INJURY REHABILITATION, <http://www.finr.net>, accessed on August 22, 2012.

[2] *See* Florida Institute for Neurologic Rehabilitation, ADULT POST-ACUTE REHABILITATION, <http://www.finr.net/adult-post-acute-rehabilitation/>, accessed on September 27, 2011.

INTENSIVE REHABILITATION PROGRAM FACT SHEET, annexed hereto at *Exhibit 4*.

60. FINR's neurobehavioral program is "based on the idea that positive teaching is a more effective way to change behavior than punishment and restriction . . . . Structure and safety are maintained through staff supervision rather than locked units, chemical restraint, or mechanical restraint." *See* Florida Institute for Neurologic Rehabilitation, Inc., NEUROBEHAVIORAL REHABILITATION FACT SHEET, annexed hereto at *Exhibit 5*.

61. FINR also promises to provide an aggressive approach to community integration. "This program is designed to teach the skills necessary for community living and to continuously apply these skills in the natural, 'real world' environment where the program trainees will be expected to demonstrate the skills." *See* Florida Institute for Neurologic Rehabilitation, Inc., COMMUNITY INTEGRATION PROGRAM FACT SHEET, annexed hereto at *Exhibit 6*.[3]

62. "The Vocational Rehabilitation Program provides individuals with neurologic impairment the skills and abilities necessary to evaluate themselves for a potential position and to sustain that position. Participation in the Vocational Rehabilitation Program includes rehabilitation for functional improvement as well as training for necessary job skills . . . Our on-campus employment includes over 80 positions . . . ." *See* Florida Institute for Neurologic Rehabilitation, Inc., VOCATIONAL REHABILITATION PROGRAM FACT SHEET, annexed hereto at *Exhibit 7*.

63. Throughout the pre-admission evaluative process, FINR promised

[3] All fact sheets discussed herein and annexed as exhibits contain information that is reproduced on its webpage. The quote cited herein from the Community Integration Program fact sheet is cut off mid-sentence. The full quote appears on FINR's website at < http://www.finr.net/adult-post-acute-rehabilitation/programs/community-integration/>.

coordination among "clients, family members, referral sources and payor sources." The goal for each patient's admission was to get "[a]ll concerned parties [to] work together to establish measurable goals and objectives for each admission. Client services are delivered through an integrated Case Management system designed to keep all concerned parties aware of clinical, medical, and behavioral progress."[4]

64. FINR warranted to Allstate, Allstate's insureds, and to the general public that it provides its patients with a comprehensive and multi-faceted treatment and evaluation program aimed at rehabilitating patients to pre-morbid normalcy and reintroducing patients into the community.

65. FINR also promotes its designation as a Brain and Spinal Cord Injury Program Designated Facility in its advertising and on its website. *See Exhibit 8 attached hereto.*

66. As such, FINR warrants that it adheres to the legal requirements of such a facility, as discussed *supra.*

67. Allstate, patients, and guardians relied on FINR's promises and representations, and also on the fact that FINR was in compliance with all applicable laws and governing regulations, when making the decision to enroll patients/insureds at FINR.

68. Allstate and its insureds also relied on the promises made with respect to each specific patient in the proposed treatment plans that were prepared by FINR personnel in advance of each patient's admission to FINR.

69. Each such proposed treatment plan that was submitted to Allstate

---

[4] *See* note 3, *supra.*

promised an "individualized comprehensive treatment plan" that "will be re-evaluated and updated as needed." *See representative proposed treatment plan attached hereto at Exhibit 9.*

70. The plans also conveyed that a full array of services would be provided to patients, including medical, behavioral, vocational, occupational, speech and language, recreational, and case management services, among others.

71. Allstate and its insureds relied on FINR's representations regarding the provision of comprehensive rehabilitative care in making the important decision to enroll at FINR.

72. As discussed herein, through its recent investigation, Allstate has discovered that FINR did not provide many of the services it promised to and those services it did provide did not constitute "comprehensive treatment" related to FINR's mission of individualized rehabilitative treatment and FINR's promised goal of re-entry into the community.

## VII. CULTURE OF ABUSE AND VIOLENCE AT FINR

73. Despite its representation that its neurobehavioral program is "based on the idea that positive teaching is a more effective way to change behavior than punishment and restriction . . . . Structure and safety are maintained through staff supervision rather than locked units, chemical restraint, or mechanical restraint," *see Exhibit 5*, FINR employees frequently engaged in violent and abusive behavior towards its patients.

74. In fact, several former FINR employees have faced criminal charges relating to the abusive and violent tactics they used on FINR patients.

75. The Florida Department of Children and Families, which investigates allegations of abuse and neglect of children and vulnerable adults, has received 514 complaints of abuse or neglect at FINR since 2005. Thirty-seven (37) of these claims have been verified by state investigators and, along with other complaints, were referred to law enforcement.

76. In 2008, University Legal Services, Inc., the protection and advocacy program for the District of Columbia, issued a report in which it detailed activities at FINR that violated patients' human rights and several District of Columbia policies prohibiting long-term seclusion and chemical restraint ("ULS report"). *See ULS report attached hereto at Exhibit 10.*

77. Following the issuance of this report, the District of Columbia began recalling its twenty-one (21) patients from FINR.

78. A recent report published by Bloomberg and authored by David Armstrong ("Bloomberg report") details the wide-spread abuse endured by FINR patients. *See Bloomberg report attached hereto at Exhibit 11.*

79. The Bloomberg report also references videos that capture the violent abuse of certain FINR patients. These several videos are available at <http://www.bloomberg.com/news/2012-07-24/brain-injured-abuse-at-for-profit-center-scandalizes-u-s-.html>, accessed on August 22, 2012.

80. The Bloomberg report describes FINR's frequent use of "take downs" as a means to control patients that were often accompanied by beatings. *See Exhibit 11.*

81. The Bloomberg report also describes the sometimes extreme measures used by FINR patients to escape a facility deemed "prison"-like by professionals in the

field. *See id.*

82. Two of the Allstate insureds who are the subject of this Complaint also described FINR as a prison.

83. Patients A.A. (Claim No. 217244850) and B.H. (Claim No. 1897127260) both stated that, in fact, they would rather have been in jail than in FINR because there is a certain end date in prison, whereas there is never an end date for "treatment" at FINR.

84. The Bloomberg report, the ULS report, the hundreds of complaints of abuse and neglect received by Florida agencies over the last few years, and the criminal proceedings instituted against former FINR employees alleging abuse of FINR patients evidence that a culture of violence and abuse predominated at FINR.

85. The existence of this culture of violence and abuse is corroborated and was directly experienced by the Allstate claimants/FINR patients who are the subject of this Complaint.

86. Indeed, as part of its pre-suit investigation, Allstate interviewed several of its insureds who are former patients of FINR, most of whom stated that they experienced abuse at the hands of FINR employees.

87. Patient A.A. (Claim No. 2172448520) described a time when three FINR staff members held him down, beat him until he was unconscious, and then dragged him across the room. He had severe bruising, scars, and a rug burn from being dragged.

88. Patient B.H. (Claim No. 1897127260) also complained of physical abuse, including an incident in which three FINR employees pushed him against the wall and jumped him.

89. Patient K.A. (Claim No. 2909659216) described instances of physical

assault by FINR employees and also abusive threats made by FINR employees, including that they would drug him or throw him to the alligators.

90. The mother of patient J.G. (Claim No. 40206901) stated that her son had several complaints about his "treatment" at FINR, including that employees would "jump" him and that beatings occurred.

91. FINR's abusive tactics were particularly evident in the context of patient discharge. Indeed, FINR resorted to numerous abusive tactics to prevent patient attrition.

92. For example, with respect to patient A.B. (Claim No. 2882309301), FINR promised A.B. that she would receive her own apartment and could go to Busch Gardens to ride all the rides if she stayed at FINR.

93. One of FINR's employees told A.B. that her (A.B.'s) guardian and mother did not know what she was doing when requesting that A.B. be discharged, leaving A.B. upset and in tears.

94. The same FINR representative also told A.B. that Allstate would stop paying her claims if she left FINR.

95. FINR told A.B.'s guardian and mother that it would not assist in A.B.'s transition from FINR to Michigan. Indeed, upon A.B.'s discharge, FINR withheld A.B.'s prescription medication, withheld medical records, refused to cooperate with A.B.'s medical providers in Michigan, and threatened to withhold funds earned by A.B. while at FINR.

96. FINR also used abusive tactics to prevent patient T.S. (Claim No. 2881939595) from leaving FINR.

97. T.S.'s case manager stated that it took months to remove T.S. from FINR.

98. FINR promised to buy T.S. a house to try to convince him to stay.

99. It was only after T.S.'s case manager threatened FINR with legal action that FINR finally agreed to discharge T.S.

100. The pervasive abuse and violence that existed at FINR stands in stark contrast to the safe and rehabilitative treatment facility that patients, guardians, and Allstate were promised by FINR and on which they relied in making the decision to place and keep patients at FINR.

101. As such, Allstate is entitled to reimbursement of all payments it made to FINR.

## VIII. <u>FINR DID NOT PROVIDE REHABILITATIVE CARE</u>

102. The goal of rehabilitative treatment is to integrate the patient back into functioning society to the best of the patient's ability.

103. Though FINR promised generally in its public representations and specifically in the proposed treatment plans prepared for each FINR patient that it would provide rehabilitative care, in fact FINR provided little to no rehabilitative treatment to the patients at issue in this Complaint.

104. As part of its investigation, Allstate sought and retained expert review of the medical files of several of the patients at issue in this Complaint.

105. As a result of this expert review, Allstate discovered that the "treatment" allegedly provided by FINR was deficient in several ways, including (1) lacking context specific programs and individualized treatment, (2) not constituting meaningful rehabilitative treatment, (3) using medical records to conceal the lack of and unreasonableness of treatment, and (4) consisting primarily of warehousing patients, not

rehabilitating them.

106. As such, the services billed to Allstate by FINR were not medically necessary and oftentimes were not rendered at all.

107. Allstate is only required to pay claims under the Michigan No-Fault Act for "[a]llowable expenses consisting of all reasonable charges *incurred* for reasonably *necessary* products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a) (emphasis added).

108. As FINR's billed-for services were not medically necessary, and as many were never actually provided to the patient, Allstate is entitled to reimbursement of all payments that it has made.

## A. FINR DID NOT PROVIDE CONTEXT SPECIFIC PROGRAMS OR INDIVIDUALIZED TREATMENT TO PATIENTS

109. As found in the expert review of FINR patient files, performed as part of Allstate's pre-suit investigation, FINR did not provide context specific programs (i.e., "here are the goals, and this is how we are going to reach them") to patients.

110. A context specific program is vital to a successful rehabilitative program.

111. Patients were admitted to FINR under an evaluation program that usually lasted between thirty (30) days to a few months.

112. After the evaluation period ended, however, patients were not reevaluated nor were specific discharge plans created.

113. FINR patients did not receive specific estimates concerning their length of stay.

114. Instead, patient stays extended into perpetuity.

115. There was rarely modification of patient goals/treatment plans.

116. Without these plans and goals, there was no way to measure changes in a patient's behavior or the efficacy of FINR's "treatment."

117. In the ordinary course of treating patients with catastrophic brain injuries, medical records should provide that a patient is expected to be treated for a certain amount of time.

118. At the conclusion of that time, if the patient does not improve or progress, the patient should be moved to a different treatment facility or the patient's treatment plan should be modified.

119. Language to this effect was absent from most of FINR's medical records, resulting in patients remaining at FINR longer than necessary and often longer than what was in the patient's best interests.

120. Indeed, in most instances, discharge from FINR occurred only at the insistence of the patient's Michigan guardian.

121. Pursuant to Michigan law, a guardian is only required to visit a patient once each quarter and will typically rely on FINR's medical records to ascertain a patient's progress.

122. Based on the false representations contained in FINR's medical records, discussed below, guardians were deceived into believing ongoing treatment was necessary.

123. This resulted in prolonged and unnecessary treatment at a substantial cost to Allstate.

## B. FINR DID NOT PROVIDE MEANINGFUL REHABILITATIVE TREATMENT

124. The services actually rendered by FINR (1) were far less than those

promised to patients at the time of their admission, and (2) did not constitute meaningful rehabilitative treatment necessary to the patient's care, recovery, or rehabilitation.

125. FINR's services consisted primarily of (1) supervision, and (2) "vocational training."

126. FINR's "vocational training" consisted of supervising patients while they worked at the greenhouse (where patients pulled weeds for their entire shift), in the woodworking shop (where patients only sanded wooden letters), at the car detailing bay (where patients washed the cars of FINR employees), or at certain off-site locations for a few hours each day.

127. Beyond providing locations where patients could work and supervising patients who required supervision while they worked, FINR did not provide any other "vocational training" to patients.

128. The FINR patients interviewed by Allstate all described their typical day at FINR as follows: wake around 7:00 AM; have breakfast; report to their vocational program (i.e., weeding, sanding, washing cars); have lunch; report to vocational program again until approximately 2:00 PM; report to living quarters for remainder of the day.

129. Twice a week, certain patients met in groups to discuss current events.

130. Once per week, certain patients were taken to Wal-Mart.

131. Occasionally, weekend trips to the mall or to the beach were planned.

132. FINR patients did not receive regular treatment and evaluation by licensed medical or neuropsychological professionals.

133. Indeed, when interviewed by Allstate, several patients stated they only saw medical professionals a few times during their respective stays at FINR, though

several were at FINR for years.

134. The supervision and "vocational training" provided by FINR did not constitute rehabilitative care, let alone meaningful rehabilitative care.

135. Moreover, the services actually provided by FINR paled in comparison to the services and treatment that FINR promised to provide, including neuropsychological treatment, medical management services, behavioral services guided by positive reinforcement, and occupational therapy.

### C. FINR'S MEDICAL RECORDS CONCEALED THE LACK OF MEANINGFUL TREATMENT

136. As a result of Allstate's expert review, undertaken as part of its pre-suit investigation, FINR's medical records were found to be deficient in several areas, including (1) lack of records concerning the efficacy of treatment, (2) lack of records demonstrating changes in goals or treatments, and (3) the use of non-specific and repetitive language regarding patient care.

137. FINR's medical records were intended to deceive Allstate into paying claims for services that were disguised as neurologic rehabilitative treatment, when such services were not rehabilitative, were unnecessary, and/or were not compensable under Michigan law.

138. FINR's medical records served two purposes: (1) they concealed the lack of rehabilitative treatment provided by FINR, and (2) based on the misrepresentation that treatment was effective, they recommended prolonged care.

139. This resulted in increased profits for FINR, and a decline in the patient's progress and chance of rehabilitation.

140. The deceptive nature of FINR's medical records is first seen in the

proposed treatment plans created by FINR before the patient's admission, which promised to provide a wide array of rehabilitative services designed to progress the patient to his or her rehabilitative goals, and on which Allstate relied in deciding that the services promised by FINR were compensable under Michigan's No-Fault Act and on which Allstate relied in agreeing to comprehensive per diem rate contracts (discussed below).

141. FINR's deceptive recordkeeping is further exemplified by the post-admission medical records FINR generated.

142. After a patient was admitted, FINR provided monthly reports to Allstate that discussed the patient's progress and recommended treatment goals.

143. These reports have little variation from month to month, including little change in goals or treatment plans.

144. Notably, several patients did not receive monthly evaluations.

145. Allstate relied on the medical records generated by FINR in approving and paying insurance claims.

146. Patients and their guardians also relied on FINR's medical records when deciding to prolong treatment at FINR.

147. These fraudulent medical reports were generated on behalf of all FINR patients insured by Allstate.

148. In each instance, Allstate relied on the misrepresentations contained in the fraudulent medical reports to pay claims that were not compensable under Michigan law.

### D. FINR PATIENTS WERE WAREHOUSED

149. Instead of receiving meaningful rehabilitative care, FINR patients were

instead essentially warehoused.

150. There may be certain discrete instances in which warehousing is in a patient's best interest.

151. However, in these instances, the medical records must reflect this fact.

152. That simply did not happen with the Allstate insureds at issue in this Complaint.

153. Instead, a proposed treatment plan was prepared by FINR and submitted to Allstate with respect to each subject patient that promised individualized treatment with the goal of rehabilitation and re-entry into the community to the particular patient's best ability.

154. As discussed above, the lack of reevaluation, the lack of individualized goals and treatment plans, and lack of discharge plans meant that patient stays at FINR extended into perpetuity.

155. Two separate Allstate insureds likened their stay at FINR to imprisonment, each finding the prospect of jail preferable because there is at least an end date when imprisoned.

156. Allstate's interviews of several FINR patients revealed that the typical day for each FINR patient, detailed above, was almost identical and rarely consisted of anything more than supervision.

157. In other words, Allstate paid for patients to be warehoused at FINR.

158. Indeed, with the exception of the few hours each day that patients received "vocational training," FINR patients were largely confined to their living quarters with no meaningful therapy or rehabilitative treatment.

159. Upon completion of their daily "vocational training" at approximately 2:00 PM each day, patients returned to their living quarters for the remainder of the day.

160. The significant hours patients were confined to their living quarters, coupled with the fact that FINR did not establish discharge plans or identify end points of care, meant patients were effectively warehoused indefinitely.

161. The State of Florida has also found that patients were kept too long at FINR.

162. In August 2012, the Florida Agency for Health Care Administration found specifically that FINR kept patients too long in violation of FINR's Florida transitional living facility license.

163. FINR was ordered to develop a new protocol for discharging patients.

164. The findings by the Florida Agency for Health Care Administration corroborate the findings of Allstate's pre-suit investigation: patients are wrongfully held too long at FINR without any identified end point.

165. This amounts to warehousing, which Allstate never agreed to pay for and which is not what FINR represented to provide to patients.

### E. <u>Exemplar Claims</u>

166. The treatment purportedly provided by FINR to Allstate insureds follows a distinct pattern wherein Allstate was billed for treatment that was not rendered, was unnecessary, was not rehabilitative in nature, or was otherwise not compensable under Michigan law.

167. This pattern of fraudulent conduct was implemented, directed, overseen, and managed by Brennick.

168. The following claims illustrate the pattern of fraudulent conduct employed by FINR and are representative of all twelve (12) patients at issue in this Complaint.

**1. M.B. (Claim No. 2170854885)**

169. Patient M.B. was injured in a motor vehicle accident on June 9, 2002, when he was thirteen years old, after falling from a moving vehicle.

170. A proposed treatment plan for M.B. was presented to Allstate on June 28, 2002.

171. The plan called for M.B. to be admitted to FINR for a period of 30 to 60 days to undergo a "course of evaluation and treatment."

172. The treatment plan stated that M.B. would be evaluated and treated by the neurology, neuropsychology, physical, occupational, and speech and language, and behavior service departments with the goal of "returning to optimal independence."

173. The evaluations were to be used "to develop an individual comprehensive treatment plan" that was to be "re-evaluated and updated as needed."

174. After his first month at FINR, an "Initial Client Service Plan/Assessment Report" was created which confirmed that M.B.'s rehabilitative services were to include "Occupational Therapy, Speech/Cognitive Therapy, Physical Therapy (consultative), Behavioral Management Services, Health Education and Medication Management Services, Educational Services, Recreational Services, Dietary Services, and Case Management Services."

175. Despite these representations, M.B. did not receive many of the therapies which he purportedly needed and for which Allstate was billed as part of the "comprehensive per diem rate" charged by FINR.

176. Indeed, M.B.'s "treatment" primarily consisted of the administration of a relatively small number of medications and supervision in his job working at the Activity Center/YMCA.

177. M.B. did not receive physical, occupation, or speech therapies while at FINR.

178. Nor did M.B. have regular contact with a psychologist or counselor at FINR.

179. The "comprehensive outcome statement" contained in M.B.'s monthly reports remained unchanged for most of the six years M.B. resided at FINR.

180. Significantly, M.B. lacked many of the indicators to justify placement at FINR in the first place.

181. M.B. was examined by a neuropsychologist retained by Allstate in 2011 as part of its pre-suit investigation.

182. That neuropsychologist found that the FINR staff, or those persons contracted by FINR, did not account for several early risk factors for abnormal neuropsychological development which showed that M.B. already had a history of serious mental illness and behavior problems before his 2002 accident.

183. The neuropsychologist also stated that, in its initial evaluation, FINR failed to address or acknowledge significant findings that could not have possibly have been related to M.B.'s traumatic brain injury.

184. The neuropsychologist concluded that FINR had recommended placement at its facility without any justification or clinically-based evidence that related M.B.'s treatment needs with the 2002 injury and that there was likely never a clinically-based

justification for placing M.B. at FINR and certainly not justification that extended beyond an initial evaluative period.

185. To the contrary, the neuropsychologist opined that M.B.'s continued placement at FINR was actually harmful to the patient because it entrenched a pattern of social isolation.

186. As FINR both misrepresented the initial need for M.B.'s placement at FINR and failed to provide M.B. with the treatment it promised, FINR was not entitled to payment from Allstate for its purported "treatment" of M.B. and Allstate is entitled to reimbursement in the amount of $1,830,595.94, representing the amount it paid to FINR relative to M.B.

**2. A.B. (Claim No. 2882309301)**

187. Patient A.B. was involved in a motor vehicle accident on August 16, 1996, at the age of five (5).

188. The November 20, 2009, proposed treatment plan for A.B. that was submitted to Allstate by FINR recommended that she be admitted for a "60 to 90 day course of evaluation and treatment."

189. As with other patients, FINR warranted that it would provide an array of rehabilitative services to A.B., including occupational therapy, physical therapy, behavior analysis, and vocational therapy.

190. However, A.B. did not receive most of these treatments and those she did receive were not reasonably charged to Allstate at the rate of $800.00 per diem.

191. For example, A.B. received occupational therapy at FINR that consisted solely of bi-weekly budget meetings.

192. The "vocational therapy" A.B. received consisted of working at a greenhouse and at a car detailing service.

193. There is no indication that any new vocational skills were being developed, however, as A.B. had been employed prior to her admission to FINR.

194. A.B.'s medical records reflect lack of attention to her needs.

195. For example, A.B. was recommended for dental, eye, and gynecological examinations at the time of her admission to FINR in December 2009.

196. None of these examinations had been performed several months later.

197. A.B.'s monthly reports remained largely unchanged throughout the course of her stay at FINR, including lack of meaningful change in goals and treatment.

198. A.B. was also examined by a neuropsychologist at Allstate's request as part of Allstate's pre-suit investigation.

199. The neuropsychologist noted A.B.'s apparent good neuropsychological recovery following her head injury in 1996.

200. The neuropsychologist found that A.B. needs mental health treatment, not brain injury rehabilitation, which could be accomplished on an outpatient basis while A.B. worked and/or attended school within her home community (i.e., Michigan).

201. The neuropsychologist further found that FINR did not have any clearly defined treatment goals for A.B. and that it was not clear how an indefinite placement at FINR would increase A.B.'s chances of success upon re-entry to her home community.

202. Based on the lack of progress and treatment from the time of A.B.'s admission to FINR throughout her time there, and based on the neuropsychologist's conclusion that FINR was inappropriate for treatment of A.B.'s needs, Allstate is entitled

to reimbursement of the $456,517.25 it paid to FINR relative to A.B.

**3. D.A. (Claim No. 2907688985)**

203. Patient D.A. was injured in a pedestrian/motor vehicle accident that occurred on October 15, 1989.

204. In the Proposed Treatment Plan submitted to Allstate on November 23, 2002, FINR recommended that D.A. undergo a "6 to 12 month course of evaluation and treatment" at FINR, promising that D.A. would be treated by a neuropsychiatrist and neurologist.

205. FINR further promised "to develop an individual comprehensive treatment plan" that would be "updated as needed."

206. FINR stated that D.A.'s rehabilitative services would include "Occupational Therapy, Speech Therapy, Physical Therapy (consultative), Educational Services, Health Education Services and Medical Management, Recreational Services, Behavioral Management Services, and Case Management Services" in its Initial Client Service Plan/Assessment Report.

207. D.A.'s monthly reports were largely unchanged from month to month.

208. D.A.'s records also fail to document exactly what treatment she was receiving.

209. D.A.'s treatment plans and long-term goals rarely changed.

210. For example, D.A.'s "vocational therapy" consisted of working at a local thrift store.

211. Despite doing "outstanding" work at the thrift store, D.A.'s treatment plan, including ratings and goals, remained the same for her vocational therapy from quarter to

quarter.

212. Much of the "treatment" recommended for D.A., and for which Allstate was billed, was questionable and/or not actually rendered.

213. For example, for several years, D.A. administered her own medication, which consisted of birth control pills.

214. D.A. did not otherwise have any medical conditions that required supervision or treatment by FINR.

215. Yet, FINR billed Allstate for medical management services.

216. An independent expert review of D.A., performed at Allstate's request as part of its pre-suit investigation, noted activities classified as occupational therapy that were questionable and not clearly related to D.A.'s long-term goals.

217. For example, the occupational therapy that D.A. received at times consisted of board games.

218. The expert also took issue with the lack of baseline data in FINR's medical records to substantiate problematic behaviors for which D.A. was recommended for treatment/intervention.

219. The expert further noted a pervasive lack of specificity in D.A.'s medical records.

220. For example, "violations" or "behavior" are mentioned in records, but there is almost never a description of the nature of the violation or behavior.

221. The expert concluded that D.A.'s test results indicate that she has minimal intellectual deficiencies, not traumatic brain injury, and that D.A. plateaued early on in her progress at FINR.

222. D.A. did not require treatment at FINR in the first place and certainly did not require FINR's services for nearly the amount of years she received them.

223. Accordingly, Allstate is entitled to reimbursement in the amount of $1,523,229.96, the amount it has paid to FINR relative to D.A.

**4. A.A. (Claim No. 2172448520)**

224. Patient A.A. was involved in a motor vehicle accident on February 19, 2006, and was admitted to FINR on April 10, 2009.

225. In its Initial Client Service Plan/Assessment Report, FINR promised to A.A. and to Allstate that it would provide an array of rehabilitative services to A.A., including vocational services, recreational services, case management services, and behavioral services, among others.

226. The "vocational services" A.A. received consisted of working in a greenhouse and a woodshop.

227. The daily records of A.A.'s vocational treatment state only "perform duties in the woodshop."

228. The notes for A.A.'s recreational treatment state only "recreational activities" and the number of units.

229. There is no discussion of exactly what the recreational activity was nor how it related to A.A.'s individual treatment plan.

230. A.A. was placed at FINR primarily due to substance abuse issues and behavioral problems.

231. The daily records of A.A.'s behavioral treatment, however, fail to demonstrate any change in A.A.'s objectives with respect to behavioral therapy.

232. In general, A.A.'s records reflect a lack of change in progress, goals, and treatment.

233. Nor is there a clear end point for treatment identified in the records, though the neuropsychological examination performed by FINR found that A.A.'s intelligence is in the average range, his "mental flexibility and categorization skill are in the superior range," and his "overall problem solving skills and visuoperception appear to be above average when compared to peers his age," which support that A.A. should be expected to and should actually achieve certain treatment goals.

234. That the records do not reflect this means that FINR's treatment was not necessary to A.A.'s care and/or that FINR did not properly measure the efficacy of its treatment and simply continued to provide the same service without any relation to A.A.'s clinical needs at the given time during his stay at FINR.

235. Under either scenario, the Michigan No-Fault Act does not obligate Allstate to pay for FINR's services relative to A.A. As such, Allstate is entitled to reimbursement in the amount of $416,225.19.

**5. K.A. (Claim No. 2909659216)**

236. K.A. was injured when he was struck by a motor vehicle on November 20, 2000.

237. In the Proposed Treatment Plan submitted to Allstate on June 11, 2009, K.A. was recommended for a "60 to 90 day course of evaluation and treatment" at FINR during which time he would be evaluated by the neuropsychology, physical, occupational, and speech and language departments "to develop an individualized comprehensive treatment plan" that would be updated as needed.

238. K.A.'s medical records are largely redundant and do not reflect that any "individualized comprehensive treatment plan" was ever followed or updated.

239. K.A.'s medical records also fail to clearly relate the services provided to K.A. with a documented basis for providing the particular service.

240. While FINR consistently states in summary reports that it is providing a full panoply of services to K.A., in fact K.A. did not receive physical, occupational, or speech and language services.

241. K.A. did receive vocational therapy, which consisted of weeding in the greenhouse and sanding wood in the woodshop.

242. K.A. has a long and documented post-traumatic history of producing quality woodworks, especially birdhouses, which calls into question the benefit of sanding wood as a primary component of his vocational therapy.

243. As FINR has not provided the services it promised to provide, and as the necessity of those services it did provide are questionable, Allstate is entitled to reimbursement in the amount of $573,241.42, the amount it paid to FINR relative to K.A.

**6. G.H. (Claim No. 2901672985)**

244. G.H. was a seven-year-old pedestrian struck by a motor vehicle on March 17, 1994.

245. FINR noted in its proposed treatment plan prepared in advance of G.H.'s 2003 admission to FINR that his skills "remained on grade level" and he "demonstrated strong abilities in algebra, vocabulary and spelling."

246. In the same report, G.H. was found to have "achieved relatively stable cognitive functioning."

247. FINR specifically found that G.H.'s "[l]anguage was within normal limits" and that his "[v]isual motor functions were within normal limits."

248. Despite these findings, FINR recommended that G.H. be admitted for a "6 to 12 month course of evaluation and treatment" that would include treatment by "[t]he physical, occupational and speech and language departments."

249. Yet G.H. did not receive services beyond schooling and behavioral therapy during his time at FINR.

250. As in every proposed treatment plan, FINR promised to "re-evaluate[] and update[] as needed" with the ultimate goal of having G.H. return home.

251. However, G.H.'s treatment goals did not change throughout the course of his stay at FINR.

252. For example, in the monthly report dated November 10, 2001, G.H. was said to have "shown great improvement in his behavior."

253. Yet, G.H.'s behavioral treatment goals (both long-term and short-term) did not change from what they were in June 2001.

254. G.H's medical records are thus indicative of the lack of individualized treatment goals and plans pervasive in FINR's records.

255. As such, Allstate is entitled to reimbursement in the amount of $206,490.42 for payments made relative to G.H.

## IX. FINR'S FRAUDULENT BILLING PRACTICES

256. Prior to admitting a new patient, FINR confirmed each patient's funding source.

257. With respect to each patient insured by Allstate, FINR obtained an

assignment from the patient/Allstate insured wherein it assumed the benefits and obligations of the auto insurance policy.

258. Prior to admission, FINR contacted Allstate directly to negotiate enrollment and payment terms for each patient.

259. For each patient, FINR obtained an authorization from Allstate, verifying that Allstate would approve claims for necessary rehabilitative treatment.

260. FINR also demanded contracts pursuant to which Allstate would pay a comprehensive per diem rate for the promised neurologic rehabilitation evaluation and treatment.

261. FINR utilized the per diem contracts to avoid having to submit itemized charges, which would have revealed that FINR was not providing the rehabilitative services it promised.

262. As detailed above, FINR failed to provide the promised rehabilitative evaluation and treatment to patients.

263. Thus, it billed Allstate for services that were not medically necessary and/or were not actually provided.

264. Under the Michigan No-Fault Act, Allstate is only required to pay for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

265. Each time FINR submitted an invoice to Allstate, it represented that the invoice contained only reasonable charges incurred for reasonably necessary services.

266. These representations were false.

267. The "comprehensive per diem rate" was supposed to encompass the full range of rehabilitative treatment (1) required by Florida law for transitional living facilities, (2) promised during admission, and (3) recommended in monthly reports, but such treatment was rarely provided.

268. Allstate relied on FINR's representations to its detriment when paying claims that were not compensable under Michigan law.

269. FINR's billing practices were also fraudulent because they contained unreasonable charges.

270. Michigan's No-Fault Act requires an insurer to reimburse all reasonable and customary charges and expenses rendered to an insured injured in a motor vehicle accident.

271. As a result of its pre-suit investigation, beginning in July 2011, Allstate began demanding itemized bills from FINR.

272. These itemized bills reflect charges that are far in excess of what is reasonable and customary.

273. For example, Allstate was charged room and board (a shared two-bedroom apartment in Wauchula, Florida) for D.A. (Claim No. 2907688985) in the amount of $375.00 a day, or $136,875.00 per year. *See invoice attached hereto at Exhibit 12.*

274. Allstate was also charged $40.50, disguised as "medical management," each time a nurse dispensed medication to D.A. *See id.*

275. As FINR misrepresented the medical necessity of, fact of, and reasonableness of its charges for services purportedly rendered to patients, FINR engaged in fraudulent billing practices when it sought payment from Allstate under the Michigan

No-Fault Act to which it was not entitled.

## X. SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

276. The defendants created, prepared, and submitted, or caused to be created, prepared, and submitted, False Medical Documentation in violation of United States law by devising and intending to devise a scheme to defraud for the purpose of obtaining money and property through false and fraudulent representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud).

277. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical records, referrals, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

278. Every automobile insurance claim detailed within involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institutions from which the drafts were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

279. The defendants either personally used the mails to further their fraudulent scheme by causing medical bills and records from FINR to be mailed to Allstate, and/or acted with knowledge that the use of the mails would follow in the ordinary course of business.

280. The defendants fraudulently represented in these mailings that they were providing comprehensive neurologic rehabilitation evaluation and treatment to Allstate's insured.

281. The defendants fraudulently represented in these mailings that Allstate's insureds would benefit from continued neurologic rehabilitation evaluation and treatment at FINR.

282. The defendants fraudulently represented that the medical treatment purportedly provided by FINR was reasonable, medically necessary, and compensable under the Michigan No-Fault Act.

283. The defendants knew that their offices, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider, or the plaintiff would use the mails in connection with each of the fraudulent claims, including issuing payments based upon the defendants' fraudulent documentation.

284. Given the volume of medical records generated by FINR and the length of patient stays at FINR, Allstate estimates that the defendants' fraudulent medical billing scheme generated hundreds of mailings. *See Exhibit 13 attached hereto* (highlighting selected examples fraudulent mailings arising from the defendants' patient/business files).

## XI. ALLSTATE'S JUSTIFIABLE RELIANCE

285. Through the submission of False Medical Documentation, FINR certified and represented to Allstate that FINR provided compensable medical treatment in compliance with the Michigan No-Fault Act.

286. As a licensed transitional living facility and CARF-accredited facility,

FINR was legally obligated to act with honesty, integrity, and in accordance with the law.

287. In instances where invoices were signed or verified by a licensed medical provider employed and/or contracted by FINR, both the medical provider and FINR were obligated, legally and ethically, to act with honesty, integrity, and in accordance with their respective professional oaths and pledges.

288. At all relevant times, FINR actively concealed from Allstate facts regarding the compensability of claims submitted to Allstate for payment.

289. At all relevant times, FINR misrepresented the nature of the treatments and therapies each patient received during the course of the patient's evaluation and treatment program.

290. In its False Medical Documentation, FINR uniformly misrepresented that it was actually performing compensable medical services and eligible to demand and/or collect No-Fault benefits under Michigan law.

291. At the time FINR submitted False Medical Documentation, Allstate reasonably believed that FINR's actions conformed to all applicable laws.

292. To induce Allstate to promptly pay fraudulent claims, FINR submitted False Medical Documentation that represented that treatment was legitimate and compensable.

293. Allstate was required, under statutory and contractual obligations, to promptly and fairly process claims within 30 days.

294. The facially valid documents submitted to Allstate in support of the charges at issue, combined with the material misrepresentations described above, were designed to, and did in fact, induce Allstate to rely on the accuracy of these documents.

295. In reliance on the representations of FINR, Allstate paid money to its detriment, monies that Allstate otherwise would not have paid if FINR had provided true and accurate information.

296. Based upon FINR's affirmative acts of concealment (discussed below), Allstate did not discover, and could not reasonably have discovered, that its damages were attributable to FINR's fraud until shortly before it filed this Complaint.

## XII. FINR'S FRAUDULENT CONCEALMENT

297. FINR's fraudulent scheme was self-concealing by its very nature, i.e., false medical reports and false invoices appearing legitimate on their face.

298. Based on FINR's efforts to conceal its harmful conduct, FINR's fraudulent scheme went undetected until Allstate had sustained substantial financial injury.

299. Despite due diligence, Allstate did not discover the true nature and scope of FINR's medical billing fraud scheme until 2011.

300. FINR was able to successfully conceal its fraudulent activity by: (1) creating a successful marketing campaign describing treatments FINR knew it would not provide to Allstate insureds; (2) generating interim medical reports making unfounded recommendations for continued treatment; (3) demanding per diem contracts to avoid having to itemize its bills; and (4) representing through False Medical Documents that treatment was compensable under Michigan law.

301. FINR's ability to conceal the fraudulent scheme was enhanced by the position of trust medical providers are typically accorded in the transaction of medical insurance claims, particularly in the area of complex traumatic brain injuries.

302. Allstate relied to its detriment upon the presumption of honesty accorded the medical documentation submitted by FINR.

303. Moreover, Allstate was required by Michigan law to promptly reimburse FINR for its submitted claims within thirty days.

304. Nothing on the face of FINR's medical records – submitted in connection with each discrete insurance claim – would have led a prudent person to believe that the medical treatment was unnecessary, was not provided as agreed, or was otherwise not compensable under Michigan law.

305. Had Allstate not been misled by FINR's fraudulent conduct and intentionally false statements, payments would not have been made on these claims.

306. It is only upon Allstate's pre-suit investigation, including most importantly the review of patients and patient medical records by retained experts, that the defendants' scheme to defraud was revealed.

307. Allstate's investigation is ongoing and new facts concerning FINR's scheme continue to be revealed.

## XIII. <u>ALLSTATE'S DAMAGES</u>

308. The defendants' pattern of fraudulent conduct caused injury to Allstate.

309. Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with No-Fault claims of $7,600,321.39, the exact amount to be determined at trial.

310. The chart annexed hereto at *Exhibit 1,* and incorporated herein as if set forth in its entirety, identifies Allstate's payments to FINR in connection with the No-Fault claims determined to be fraudulent as of the filing of this Complaint.

311. Allstate's damages continue to accrue.

## XIV. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against Joseph Brennick)

312. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

313. In connection with each of the claims identified herein, Brennick intentionally caused to be prepared and mailed False Medical Documentation in connection with Allstate insurance claims, in furtherance of a scheme to defraud.

314. Brennick employed (or caused to be employed) the U.S. Mail on two or more occasions to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at *Exhibit 13.*

315. Among other things, FINR invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

316. Policies of insurance were delivered to insureds through the U.S. Mail.

317. FINR's medical reports and invoices were delivered to Allstate through the U.S. Mail.

318. Payments to FINR issued by Allstate traveled through the U.S. Mail.

319. At all relevant times, Brennick repeatedly and intentionally submitted (or caused to be submitted) FINR invoices and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at FINR to collect

payment from Allstate under the first-party benefits portion of Allstate policies and the Michigan No-Fault Act.

320. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to FINR, for the benefit of Brennick, that would not otherwise have been paid.

321. The defendants' pattern of submitting, or causing to be submitted, fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling this scheme to continue without being detected.

322. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

323. By mailing (or causing to be mailed) numerous fraudulent claims in an ongoing scheme, Brennick engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

324. The activities alleged herein had the direct effect of causing funds to be transferred from Allstate to FINR, for the benefit of Brennick.

325. Allstate is in the business of writing insurance and paying claims in the State of Michigan. Insurance fraud schemes, such as the scheme alleged in this Complaint, have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

326. FINR constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

327. At all relevant times, FINR was engaged in the business of evaluating, treating, and rehabilitating traumatic brain injury and neuropsychiatric disorders.

328. Brennick managed and directed the operations of the FINR enterprise, and participated, both directly and indirectly, in the conduct of the FINR enterprise through a pattern of racketeering activities, including mailing, or causing to be mailed, False Medical Documentation to Allstate.

329. At all relevant times, Brennick operated, managed, and was ultimately responsible for the affairs of FINR, including the management of FINR's day-to-day business affairs, the management of FINR's financial affairs, and management of FINR's employees.

330. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of Brennick's conduct.

331. Brennick's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

332. By virtue of Brennick's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by FINR as a direct result of Brennick's operation and management of the FINR enterprise, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## COMMON LAW FRAUD
## (Against All Defendants)

333. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 311 set forth above as if fully set forth herein.

334. The defendants' scheme to defraud Allstate was dependent upon a

succession of material misrepresentations of fact concerning FINR's claims for neurologic rehabilitative treatment that were not compensable under Michigan law.

335. The misrepresentations of fact by the defendants include, but are not limited to, statements made in marketing and advertising materials, per diem contracts between FINR and Allstate, proposed treatment plans, monthly treatment updates, and invoices/bills that falsely represented that FINR would provide comprehensive neurologic rehabilitation evaluation and treatment.

336. The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

337. These misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims for services that were not compensable under Michigan law.

338. These misrepresentations were made in bad faith, with no intention of performance.

339. These misrepresentations were nothing more than a device to perpetrate a fraud against Allstate.

340. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous unreasonable, unnecessary, inappropriate, and non-meritorious bills purporting to be for compensable No-Fault insurance claims.

341. Allstate's damages include, but are not limited to monies paid in connection with fraudulent claims, reasonable costs and fees.

**COUNT III**
**PAYMENT UNDER MISTAKE OF FACT**
**(Against Florida Institute for Neurologic Rehabilitation, Inc.)**

342. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 311 set forth above as if fully set forth herein.

343. Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the defendants' scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided.

344. Allstate sustained damages by paying under a mistake of fact the claims submitted by, or on behalf of, FINR, which misrepresented the reasonable, necessity, and/or fact of the medical treatment allegedly rendered.

345. FINR would be unjustly enriched if permitted to retain the payments made to it by Allstate under a mistake of fact.

346. Allstate is entitled to restitution from FINR for all monies paid to and/or received by it from Allstate.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

347. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 311 set forth above as if fully set forth herein.

348. When Allstate paid FINR, it reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and/or omissions.

349. Allstate's payments constituted a benefit that the defendants aggressively

sought and voluntarily accepted.

350. The defendants wrongfully obtained payments from Allstate through their fraudulent billing scheme as described more fully above.

351. Retention of these benefits would violate fundamental principles of justice, equity and good conscience.

## COUNT V
## BREACH OF CONTRACT
## (Against Florida Institute for Neurologic Rehabilitation, Inc.)

352. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 311 set forth above as if fully set forth herein.

353. With respect to patients insured by Allstate, Allstate was induced by FINR to enter into contractual agreements for the provision of comprehensive neurologic rehabilitative treatment.

354. In exchange for the provision of neurologic rehabilitative treatment, Allstate agreed to pay FINR a fixed daily (i.e., per diem) cost for treatment.

355. These agreements were entered into based on the representation that FINR would provide neurologic rehabilitative evaluation and treatment that met legal requirements, was consistent with services advertised and/or discussed upon admission, was recommended in monthly reports, and was compensable under Michigan law.

356. FINR breached these contracts by failing to provide the promised course of neurologic rehabilitative evaluation and treatment, by providing services that were not reasonably necessary, and by submitted unreasonable charges for those services it did provide.

357. As a direct result of FINR's breach, Allstate is entitled to reimbursement

of all monies paid under the terms of the per diem contracts between FINR and Allstate.

## XV. DEMAND FOR RELIEF

WHEREFORE, plaintiff Allstate Insurance Company respectfully prays that judgment enter in its favor as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT II
### COMMON LAW FRAUD

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its reasonable costs and fees; and

(c) GRANT any other relief this Court deems just.

### COUNT III
### PAYMENT UNDER MISTAKE OF FACT

(a) AWARD Allstate its actual damages in an amount to be determined at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT IV
### UNJUST ENRICHMENT

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its reasonable costs and fees; and

(c) GRANT any other relief this Court deems just.

**COUNT V**
**BREACH OF CONTRACT**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its reasonable costs and fees; and

(c) GRANT any other relief this Court deems just.

## XV. JURY TRIAL DEMAND

The plaintiff demands a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully Submitted,

Daniel A. Martinez
Florida Bar ID No.: 00009016
Attorney for Allstate Insurance Company
CALLAHAN & MARTINEZ, L.L.C.
2935 1st Avenue North, 2nd Floor
St. Petersburg, FL 33713
Telephone: (727) 894-3535
Fax: (727) 502-9621
E-mail: dan@callahanmartinez.com

and

Richard D. King, Jr. (*pro hac vice pending*)
Nathan A. Tilden (*pro hac vice pending*)
Michael W. Whitcher (*pro hac vice pending*)
Jacquelyn A. McEttrick (*pro hac vice pending)*
Attorneys for Allstate Insurance Company
SMITH & BRINK, P.C.
350 Granite Street, Suite 2303
Braintree, MA 02184
Telephone: (617) 770-2214
Fax: (617) 774-1714
E-mail: rking@smithbrink.com
E-mail: ntilden@smithbrink.com
E-mail: mwhitcher@smithbrink.com
E-mail: jmcettrick@smithbrink.com

Dated: August 24, 2012

Respectfully Submitted,

Daniel A. Martinez
Florida Bar ID No.: 00009016
Attorney for Allstate Insurance Company
CALLAHAN & MARTINEZ, L.L.C.
2935 1st Avenue North, 2nd Floor
St. Petersburg, FL 33713
Telephone: (727) 894-3535
Fax: (727) 502-9621
E-mail: dan@callahanmartinez.com

and

Richard D. King, Jr. (*pro hac vice pending*)
Nathan A. Tilden (*pro hac vice pending*)
Michael W. Whitcher (*pro hac vice pending*)
Jacquelyn A. McEttrick (*pro hac vice pending*)
Attorneys for Allstate Insurance Company
SMITH & BRINK, P.C.
350 Granite Street, Suite 2303
Braintree, MA 02184
Telephone: (617) 770-2214
Fax: (617) 774-1714
E-mail: rking@smithbrink.com
E-mail: ntilden@smithbrink.com
E-mail: mwhitcher@smithbrink.com
E-mail: jmcettrick@smithbrink.com

Dated: August 24, 2012